The Board of President and Directors of the St. Louis Public Schools, Appellant, *v.* Mary Fritz and Charles Fritz her husband, and George Bayha, Administrator of Gottfried Schoenthaler, deceased, Respondents.

*Lands and Land Titles — Confirmations—Public Officers—Surveyor.*—The act of Congress of June 13, 1812, was by its terms a direct grant of lands to all persons who could show that they came within the provisions of ths first section, and no public officer could in any way impair that right by any subsequent action.

### *Appeal from St. Louis Circuit Court.*

This was an action of ejectment. The plaintiff's evidence was the same as in the Risley case.

The defendants read in evidence a concession to Charles Leveille (or Leveiller), dated 1st of March, 1788, by which Manuel Perez, Lieut. Governor, upon the petition of Charles Leveille, a free negro, who had been the slave of the late Louis Robert, conceded to the said Charles Leveille, his heirs and assigns, in fee simple, " a lot of ground sixty feet front only, by one hundred and fifty feet deep, situated in this town of St. Louis, bounded on one side by the lot of Louis Ride's heirs, on the other by the king's domain, on its rear by the Mississippi river, and on its principal front by the road which leads from Second street to Prairie-à-Catalan," under the condition, &c.

The defendants then proved by the testimony of Madame Papin, Jean Pourcelli, Jacques L'Abbé, J. B. Hortiz, P. D. Barada, David Adams, and R. Dowling, that prior to the

change of government the said Charles Leveille (or Level-lier) and his wife lived on the lot described; that the southern boundary of it was what is now known as Hazel street; the western boundary, the continuation of Second street, then a road leading to Carondelet (Prairie-à-Catalan); the northern boundary, the lot of Louis Ride's heirs; and the eastern boundary, the river Mississippi. That there were, before 1800, large fruit trees on the lot, some as thick as a man's body. The house was then old; the fence was along the Second street front and the Hazel street front, and extended eastward to the river bank, which was then within 150 feet of where Second street is now; that the river ran deep between the present location of Main street and Second street; that the bank of the river was steep; that the eastern fence of Leveille ran along the top of it, and that sometimes the river carried away the bank, and the fence had to be moved back. There was no street or road east of Leveille's lot; there was sometimes a path, but it was very difficult for a person on foot to get along that path when the water was high; he had to hold on to the fence to save himself from falling into the water.

Charles Leveille and his wife lived on this lot until the death of the old man, which occurred in 1809 or 1810. His widow lived on it until her death in 1826, or thereabouts; she sold part of it to a person named Longtin. Schoenthaler subsequently got possession by purchase of the northern half of this lot, and continued to occupy it for many years up to his death. After 1844 the river changed its course; a great filling up took place from Plum street southward, and the river receded several hundred feet to the eastward. What was called Duncan's Island lay nearly opposite this lot. The main channel of the river used to run west of Duncan's Island; now, Duncan's Island is west of the new levee or Front street. Main street, as now established, was laid out in 1853–4; old Main street was much farther westward.

In Spanish times, and up to 1844, Main street did not run below Plum street. If you had continued the street farther

below Plum street, you would have run into the river. Plum street is the street south of Poplar; then comes Cedar, then Mulberrry, then Lombard, and then Hazel. All these names, and the streets themselves for the most part, are modern. There was a rocky shore from Plum street northward to Cherry street; there was no rock on the western bank south of Plum. There was no street in Spanish times where Hazel street now is, nor was there any cross street south of it. The continuation of Second street southward went over the bridge across Mill creek; it ran very nearly as Second street now runs. The bridge was the only place where you could cross Mill creek in those days.

The plaintiff, in rebuttal, called Charles Sanguinette, who testified that he was 80 years old. He formerly resided in the southern part of the town of St. Louis. There was a road along the top of the bank of the river in front of the town in Spanish times, about 15 or 16 feet wide—not less than that: this road ran between the east part of Leveille's lot and the river. On cross-examination, he said that this road crossed Mill creek at the bridge on the road to Carondelet; that Main street came down below Leveille, and that at some distance above Leveille it ran into the river; that from that point to the lower end of the town it was only a road 15 or 16 feet wide; thinks Main street passed east of Leveille at the time of the change of government.

Plaintiff read the deposition of William Boly, who testified that he was born in 1785; lived in St. Louis in Spanish times; there were but few houses in the southern part of the city then. During Spanish times Main street ran to Baptiste Lebeau's, and below that it was a tow-path about 25 feet wide to Mill creek. On cross-examination, he said that the hands of the boats used to walk along the front of the lower part of the town to warp up their boats. If the water was low, they walked under the bank; if it was high, they walked on top of the bank. Did not know whether any one but boat hands used this road; supposed they might have done so.

Plaintiff then read the following papers :

1. Chouteau's plat of the old town of St. Louis, certified by the U. S. Recorder of land titles to be a copy of the original on file in his office.

2. The plat of the town of St. Louis compiled by Surveyor-General Conway in 1846, March 12.

3. A plat of the town of St. Louis by James M. Loughborough, certified April 14, 1859.

4. Plat of township 45 north, of range 7 east, of St. Louis county.

Also, certified copies of plats of blocks 43, 44 and 45 of the town of St. Louis, made in 1835.

Also, a certified copy of a survey, made in 1855, of a confirmation of $60 \times 150$ feet to Charles Leveille ; this was numbered 394. It covered $64\frac{4}{12}$ feet on Second street, and ran east 150 feet French measure, or $160\frac{5}{12}$ feet English measure.

The plaintiff then read a concession, confirmation and survey of land to Louis Ride, lying north of Leveille's lot.

The defendants objected to all these papers for irrelevancy, but the court admitted them.

Plaintiff then read a deed from the widow of Leveille (or Levellier), dated 24th of February, 1825, conveying to Pierre Longtin a certain lot or parcel of land in the city of St. Louis, containing 30 feet front on the Mississippi river by 120 feet in depth running westwardly : " bounded on the east by a road separating it from the Mississippi, north by Francis Tayon, on the west and south by land or lots reserved by me, which land belongs to me as appears by a concession of a larger quantity in Livre Terrein."

The plaintiff then read a list of lands certified from the office of the Recorder of land titles. This was objected to by defendants.

Defendants recalled David Adams and Richard Dowling to contradict the testimony of Sanguinette and Boly.

The court at the request of plaintiff gave the following instructions :

1. The eastern boundary line of the corporation of St. Louis of 1809, read in evidence, and the eastern line of the outboundary of December 8, 1840, read in evidence, both extend to the eastern boundary of the State of Missouri, which is in the middle of the main channel of the Mississippi river.

2. The defendant in this case has set up no title in himself or those whom he represents, or under whom he claims, but seeks to maintain his possession, as a mere intruder, by setting up a title in a third person, with whom he has no privity.  In such a case, it is incumbent upon the party setting up the defence to establish the existence of such an outstanding title beyond all controversy.  It is not sufficient for him to show that there may be possibly such a title.  If he leaves it in doubt, that is enough for the plaintiff. Where a plaintiff has a *prima facie* good title, he has a right to rely on such title, and is not bound to furnish any evidence to assist the defence.  It is not incumbent on him negatively to establish the non-existence of such an outstanding title, but it is the duty of the defendant to make its existence certain.

At the request of the defendants, the court gave the following instructions, plaintiff excepting thereto :

1. The jury is instructed that if they believe from the evidence, that, prior to and on the 20th December, 1803, a person named Leveille inhabited, cultivated and possessed a lot of ground in the town of St. Louis, bounded west by Second street, on the east by the river Mississippi, on the south by a line parallel to Hazel street and near to it, and on the north by another parallel line, sixty feet distant from the first parallel ; that Leveille claimed this lot as his own ; that he continued on the same lot until his death, which occurred before 1812, but that his widow, claiming the same under him, continued to reside there until after 1812 ; that the west or right bank of the river was then nearer to Second street than it now is ; that the premises in controversy are

included within Second street on the west, the Mississippi on the east, and the north and south lines of Leveille's possession extended to the bank of the river in its new position, then the plaintiff cannot recover, and the jury must find for the defendants.

2. The jury is further instructed that if they find from the evidence that there was, for the convenience of those who occupied the lot of Leveille and the adjoining neighbors and others, a road left along the front of it, between it and the river, and that when the river receded this road was removed further east, and when the river rose it was extended further west ; and that the same was the case with the enclosure of Leveille ; there is no presumption thence arising against the ownership by Leveille and those claiming under him, up to the middle of the main channel of the river, subject to the easement of the public to use the river as a highway, and to cordel the boats used in navigating it by means of the road above spoken of.

3. The jury is instructed that the concession to Leveille read in evidence, dated 1st of March, 1788, is evidence of the extent of his claim to the ground therein described, and evidence that he claimed to the Mississippi river.

4. The jury is further instructed that the first section of the act of 1812 confirmed the titles of the inhabitants of the town of St. Louis to lots inhabited, cultivated or possessed by them on the 20th of December, 1803, according to their claims thereto.

5. The jury is further instructed that nothing done by any officer of the United States subsequently to the 13th of June, 1812, has any effect to limit or impair any rights accruing to any individual under that act.

The court refused the following instructions, plaintiff excepting :

1. If the jury believe from the evidence that in accordance with the plan of the town of St. Louis, as laid out in 1764,

there was between the front row of lots and the river a space of ground left for a street, road, or tow-path, or levee, or dedicated to any other use common to the inhabitants thereof or the public, then said lots are not riparian, and not entitled to alluvion.

2. The jury are instructed to disregard all parol evidence tending to establish a boundary of a lot varying from that of other lots of the same tier, if they are satisfied from all the evidence in the cause that such uniformity was a part of the plan of the Spanish town of St. Louis.

3. If the jury believe that block 44, to which the land in controversy is claimed as an accession through alluvion, was by the United States surveys, in 1835, surrounded on all sides by streets, and said surveys have stood from that time to the present as the approved surveys of the town, without appeal, the owners of the lots then surveyed are estopped from claiming any ground beyond the street which is by such surveys made its eastern boundary.

4. The call for the river as the eastern boundary of the lot of Leveille, in the original concession of the Lieut. Governor, is not conclusive evidence that the lot is riparian; but if the jury believe from the maps and plats in evidence, and all the evidence in the case, that the Spanish authorities intended to leave a space between the tier of lots of which block 44 is one, and the river, for continuation of Main street or Front street, or for any other public purpose, said call will be disregarded.

5. If the jury believe from the evidence that prior to December 20, 1803, there was a road or passway between the front row of the lots in the former town of St. Louis and the Mississippi river, and that the river after that time washed away the land so that the western edge or bank thereof was west of said road or passway, and west of the eastern boundary line of said lots, and that afterwards the river receded so that the present western edge or bank thereof is no farther

west than where it was prior to December 20, 1803, the owners of said lots are not entitled to riparian rights.

6. The jury will find for the plaintiff, if they believe from the evidence that all the maps, plats, surveys, deeds, and other documents and instruments read in evidence by the plaintiff are genuine, and that the premises in controversy are within the boundaries of the corporation of 1809, read in evidence, and within the outboundary of December 8, 1840, read in evidence, and also within the School assignment, being survey 400, read in evidence ; and that the land described in the deed from the City of St. Louis to the plaintiff, read in evidence, includes the land that is described in the petition of the plaintiff, and also that the land described in the petition is not within the boundaries of any land confirmed to any person or persons.

7. If the jury believe from the evidence that the defendants claim under a confirmation, and that the survey of that confirmation does not call for the river as a boundary, they are estopped by that survey, and cannot claim any rights as riparian proprietors.

8. The jury are instructed that, as a question of law, the owners of lots in the town of St. Louis, as said town existed prior to December 20, 1803, have never had any riparian rights.

9. If both the confirmation and the surveys of the United States to private individuals, for the most eastern row of lots west of the premises in controversy, do not call for the Mississippi river as a boundary, then the owners of said lots are not entitled to said premises as riparian proprietors.

10. If the jury believe from the evidence that there was a street or tow-path, or passway, for the use of the public, between the Mississippi river and the most eastern row of lots in the former town of St. Louis, as said town existed prior to December 20, 1803, then and in that case the owners or claimants of said lots are not riparian proprietors of the lands between said lots and the said river.

*Taussig*, for respondents.

I. The court improperly permitted to be used in-evidence the receipt purporting to be signed by Francis Molair, city marshal.

II. The plaintiff by its proof established a *prima facie* title, and was entitled to recover, unless the defendants succeeded in convincing the jury that the land in controversy was confirmed to another person.

The eighth instruction asked by plaintiff should have been given—Kissel v. Schools, 18 How. 25; Soulard v. Jones, 24 How. 41.

III. The first, second, third, fourth, sixth and seventh instructions asked by plaintiff, and refused, are correct declarations of the law regulating riparian rights as declared by this court—Smith v. Pub. Schools, 30 Mo. 295, and cases cited in my brief in Pub. Schools v. Risley's Heirs (*ante* p. 362–3).

The refusal of the court to grant any of these instructions deprived the plaintiff of the benefit of all the testimony introduced by it to show the existence of a street or tow-path at the eastern boundary line of the river lots—Morgan v. Livingston, 6 Mart. 225; Cochran v. Fort, 7 Mart. (N. S.) 626; Cotton Press Cas. 18 La.; Livingston v. Hermann, 9 Mart. 656; Packwood v. Wolden, 7 Mart. (N. S.) 88; U. S. v. New Orleans, 10 Pet. 662.

Where a confirming act does not provide for a survey, and the boundaries of the land confirmed are defined by a Spanish survey or otherwise, no survey is necessary; but if a survey is required by the confirming act, or is necessary because of the absence of definite boundaries, it becomes binding between the confirmee and the Government.—See Act creating Surv.-Gen.'s Office, 3 U. S. Stat. 325; West v. Cochran, 17 How. 412–17; Magwire v. Tyler, 1 Black. 198; Dent v. Sigerson, 29 Mo. 489; Cutter v. Waddingham, 33 Mo. 282; Burgess v. Gray, 16 How. 48, 65.

*Gantt,* for respondents.

The respondents submit that the following propositions of facts are established by the record, viz. :

1. That the original concession to Leveille embraced a piece of land bounded west by Second street, or the road which was its continuation, east by the river Mississippi, south by land on which Hazel street was afterwards laid out, and north by land of Louis Ride's heirs.

2. That Leveille and his wife took possession of this lot, built upon it, laid out a garden and orchard, and in 1803, and for a long time previous, inhabited, cultivated and possessed the same, up to the limits and boundaries above indicated, claiming title thereto as proprietors.

3. That there was no street east of Second street, south of Plum street, for many years after the acquisition of Louisiana.

4. That in 1800, and for more than twenty years afterwards, the distance from Second street to the river, below Plum street, was much less than it is now ; that it was then not more than one hundred and fifty or two hundred feet at most ; that the lots below Plum street, fronting on Second street, extended eastwardly to the river ; and that this was. emphatically true of the lot inhabited, possessed and culti-. vated by Leveille.

If these propositions of fact be established, it will result as a conclusion of law that this lot extended to the middle of the main channel of the stream, and that upon any receding of the river, leaving a part of this space dry, or reclaimable, the right of Leveille to the ground thus reclaimed became absolute ; that is, free from the easement of navigation, etc., which the public enjoyed in respect of this part of his lot when it was covered by water capable of floating boats— Jones v. Soulard, 24 How. 41 ; Le Beau v. Gaven, 37 Mo. p. 556.

WAGNER, Judge, delivered the opinion of the court..

This was an action of ejectment commenced by the appel-

lant against the respondents to recover a lot of ground in the city of St. Louis. There was a trial before a jury and a verdict for the respondents. The evidence adduced by the appellant was substantially the same as in the case of the same plaintiff v. Risley's Heirs, decided at this term (*ante* p. 356).

An attempt is made to distinguish this case from Risley's by showing a confirmation and survey of the premises by United States officers subsequent to 1812, and assigning different calls for the boundaries of the lot to Leveille from those shown in the original concession and proved by the witness. The act of June 13, 1812, confirmed the title to all those who inhabited, cultivated and possessed lots prior to 1803, and amounted to a complete investiture and muniment of title immediately on the passage of the act, and it was not competent for any officer to in anywise impair that title by any action posterior to the passage of the law. We will not entertain the objection urged against the admission of the receipt of Molair, the city collector. The only exception that is made to it here is, that there was no proof offered of its execution. The objection was not made specifically in the court below, and if it had been, it could have been easily obviated when the witness was on the stand giving in his testimony. This court will give no encouragement to a course of practice which would enable a party to reap an advantage, when he himself has led his antagonist into an error or omission.

We cannot see on what principle the appellant can complain in regard to the outstanding title, when the court gave the very instruction that it asked, and which is certainly sufficiently favorable to it. The respondents might feel aggrieved at the instruction, but surely the appellant cannot.

The other questions arising on the record have been already discussed and decided at this term in the case of the Schools v. Risley, which must also determine this.

Judgment affirmed. The other judges concur.